# Supreme Court of Florida

_____

No. SC15-1449
_____

**FRANK A. WALLS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[October 20, 2016]
<u>**CORRECTED OPINION**</u>

PER CURIAM.

This case is before the Court on appeal from an order summarily denying a motion to vacate a sentence of death under Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from a sentence of death, this Court has jurisdiction of the appeal under article V, section 3(b)(1), Florida Constitution. For the reasons that follow, we reverse the summary denial of Walls' intellectual disability claim and remand for the circuit court to conduct an evidentiary hearing under the appropriate standards.

## FACTS AND PROCEDURAL HISTORY

We have described the facts of this case as follows:

Frank A. Walls was convicted of felony murder in the death of Edward Alger and premeditated and felony murder in the death of Ann Peterson in Okaloosa County in July 1987. Alger's and Peterson's bodies were discovered in Alger's home when he failed to report for duty at Eglin Air Force Base. Peterson was shot twice in the head; Alger was shot three times and his throat had been cut. Alger's feet and left wrist were also tied with a curtain cord.

Based on information given to investigators by Walls' former roommate, who lived adjacent to the victims, a warrant was obtained to search the mobile home where Walls lived with a roommate. During the search, several items were seized that were linked to the crime scene.

After his arrest, Walls gave a statement detailing his involvement in the murders. In his confession, Walls stated that he entered the house to commit a burglary and that he deliberately woke up the two victims by knocking over a fan. Walls made Peterson tie up Alger and then Walls tied up Peterson. At some point, Alger got loose from the bindings and attacked Walls. Walls tackled Alger and cut him across the throat with a knife. However, Alger continued to struggle, knocked the knife from Walls' hand, and bit Walls on the leg. Walls then pulled out a gun and shot Alger in the head several times. Walls untied Peterson and informed her that he did not originally intend to harm them, but Alger's attack had changed everything. During a struggle, Walls ripped off Peterson's clothes and shot her in the head. When Peterson continued to scream, Walls pushed her face into a pillow and shot her in the head a second time.

Walls v. State (Walls III), 926 So. 2d 1156, 1161 (Fla. 2006). Walls was charged

with ten offenses, some of which were subsequently dismissed or reduced at trial.

Walls v. State (Walls II), 641 So. 2d 381, 384 (Fla. 1994).

Walls pled not guilty and filed several pretrial motions, including a motion to determine his competency to stand trial. Five experts testified, three stating Walls was incompetent and two finding he was competent. The trial judge agreed with the latter two experts and held that Walls was competent to stand trial. The jury found Walls guilty of all charges submitted and later recommended life imprisonment for the murder of Alger and death for the murder of

Peterson. The trial judge concurred. The conviction later was reversed and a new trial ordered.

Id. at 385 (citing Walls v. State (Walls I), 580 So. 2d 131 (Fla. 1991)).

At Walls' retrial, venue was moved to Jackson County because of pretrial publicity. The State's guilt phase evidence consisted of physical evidence, testimony by the investigating officers, testimony by a pathologist, and Walls' taped confession, which was played for the jury. Walls presented no guilt phase case. The jury found Walls guilty on all charges—two counts of first-degree murder, burglary of a structure, armed burglary of a dwelling, and two counts of kidnapping and petit theft.

During the penalty phase, Walls presented evidence of his long history of violent and threatening behavior, his various emotional problems, and his extensive treatment for emotional problems, including placement in a class for emotionally handicapped students in elementary school and a stay in a residential youth camp for children with emotional and behavioral problems at age fifteen. A psychiatrist who had treated Walls when he was sixteen years old stated that he had placed Walls on lithium in order to control his bipolar mood disorder. However, the psychiatrist also testified that at some point Walls ceased taking the drug. A psychologist testified that Walls' IQ had declined substantially in the years prior to trial and that Walls was impaired during the time the murder was committed.

The jury recommended the death penalty for Peterson's murder by a unanimous vote. Because of the prior jury's recommendation of life, double jeopardy precluded the possibility of a death penalty for Alger's murder on retrial. See [Walls II, 641 So. 2d at 386 n.1]; see also art. I, § 9, Fla. Const. The judge sentenced Walls to death for Peterson's murder, to a life sentence for Alger's murder, to five years in prison for the burglary of a structure, to twenty years for the armed burglary of a dwelling, to twenty years for each of the kidnapping counts, and to two months for petit theft.

Walls III, 926 So. 2d at 1162.

As to Walls' death sentence, the judge found six aggravators: prior violent felony for the contemporaneous murder of Alger; committed during a burglary or

- 3 -

kidnapping; committed to avoid lawful arrest; committed for pecuniary gain; the murder was especially heinous, atrocious, or cruel (HAC); and the murder was cold, calculated, and premeditated (CCP). Walls II, 641 So. 2d at 386. The judge specifically rejected the existence of the statutory mental health mitigators, but found nine mitigating factors: Walls had no significant criminal history, was nineteen years old at the time of the crime, had been classified as emotionally handicapped, suffers from brain dysfunction and brain damage, functions intellectually at the level of a twelve year old because of his low IQ, confessed to the crimes and cooperated with the police, has a loving relationship with his parents and disabled sibling, is a good worker when employed, and has shown kindness to helpless people and animals. Walls III, 926 So. 2d at 1162.

On direct appeal after the retrial, Walls raised nine issues:

(1) the trial court should have excused a potential juror for cause or granted the defense an additional peremptory challenge to excuse the juror; (2) the State improperly exercised peremptory challenges to dismiss two black jurors based on their race; (3) the jurors were kept in session for overtaxing hours during trial; (4) the trial court gave the jury erroneous penalty phase instructions on the mitigating factors of mental disturbance, impairment, or duress and on the aggravating factors of HAC and CCP; (5) the trial court refused to provide the jury with a detailed interpretation of emotional disturbance as a mitigating factor; (6) the trial court made errors in its findings on the aggravating factors because HAC and CCP were not proven beyond a reasonable doubt, the evidence did not support the conclusion that the murder occurred during a kidnapping, the commission during a burglary aggravating factor impermissibly doubled the pecuniary gain factor, and the avoid arrest aggravator was improper; (7) the trial court required Walls to prove the mitigating factors by a preponderance of

the evidence; (8) the trial court improperly rejected expert testimony that Walls was suffering from extreme emotional disturbance and substantial impairment; and (9) the death sentence was not proportionate in his case. This Court found no error and affirmed the judgment and sentences. The United States Supreme Court subsequently denied Walls' petition for certiorari. See Walls v. Florida, 513 U.S. 1130 (1995).

Id. at 1162-63 (citation omitted).

Walls filed his initial postconviction motion in 1997, amending it later that year and again in 2001. Id. at 1163. The second amended motion raised nine claims:

(1) [Walls] was denied a fair guilt phase proceeding due to ineffective assistance of counsel, prosecutorial misconduct, and trial court error; (2) counsel conceded guilt and eligibility for the death penalty without Walls' consent; (3) he was denied a fair penalty phase proceeding due to ineffective assistance of counsel, prosecutorial misconduct, and trial court error; (4) counsel failed to obtain an adequate mental health evaluation in violation of Ake v. Oklahoma, 470 U.S. 68 (1985); (5) his death sentence is unconstitutional because he is mentally retarded; (6) the trial court did not independently weigh the aggravating and mitigating circumstances; (7) the trial court considered inadmissible victim impact evidence; (8) the jury was improperly instructed on the aggravating factors; and (9) the cumulative effect of these procedural and substantive errors deprived him of a fair trial.

Id. at 1163 n.1.[1] The circuit court held an evidentiary hearing on some of Walls'

claims, but eventually denied relief on all of them. Id. at 1163-64.

---

1. The term "intellectual disability" will now be used in place of "mental retardation." See Fla. R. Crim. P. 3.203.

Walls appealed the denial to this Court raising two claims encompassing several subclaims: the circuit court erred in (1) denying Walls' ineffective assistance of counsel claims for counsel's "failure to exclude and object to the admission of evidence of a possible sexual battery, failure to object to a lack of remorse argument by the prosecutor during closing argument, concession of guilt to the facts of felony murder and to the aggravating factor of commission during a burglary, and failure to object to a number of other prosecutorial comments and arguments"; and (2) denying Walls an evidentiary hearing on his other five ineffective assistance of counsel claims[2] and his claim that his death sentence is improper because he is intellectually disabled. Id. at 1164-65, 1169-70. This Court affirmed the denial of relief as to all but Walls' intellectual disability claim. This Court found no error in denying a hearing on that claim because this Court adopted Florida Rule of Criminal Procedure 3.203[3] subsequent to the circuit

_____

2. These claims were that counsel failed to present: (1) expert testimony on the effects of Ritalin, (2) a pharmacologist's testimony about the effects of Walls' drug and alcohol use, (3) an adequate mental health evaluation including a PET scan to show brain damage, and (4) lay testimony on mitigation. Claim (5) was that counsel should have filed a motion asserting that the death penalty was barred by double jeopardy because retrial was caused by the prosecutor's misconduct. Walls III, 926 So. 2d at 1169-70.

3. This rule allows death-sentenced prisoners to file motions for determination of intellectual disability even in cases where their direct appeal proceedings are final. Id. at 1174. The rule defines "intellectual disability" as having three elements: (1) significantly subaverage intellectual general functioning that (2) exists concurrently with deficits in adaptive behavior and which has (3)

- 6 -

court's ruling.  Id. at 1174.  Thus, this Court stated, "Walls may still file a rule 3.203 motion for a determination of [intellectual disability] as a bar to execution in the trial court and is entitled to an evidentiary hearing on that motion."  Id.

On June 23, 2006, Walls filed his first successive postconviction motion pursuant to rules 3.203 and 3.851, raising only the intellectual disability claim.  On July 10, 2007, the circuit court held an evidentiary hearing at which defense expert Dr. Jethro Toomer and State expert Dr. Harry McClaren testified regarding Walls' mental condition.  The court denied relief on July 16, 2007, finding no intellectual disability because Walls' lowest IQ score of 72 did not meet the definition of subaverage intellectual functioning then in place, which required an IQ of 70 or below.[4]  This Court affirmed, finding "no evidence that Walls has ever had an IQ of 70 or below."  Walls v. State (Walls IV), 3 So. 3d 1248 (Fla. 2008) (table).

On May 26, 2015, Walls filed his second successive postconviction motion, under rules 3.851 and 3.852.  The next day, he filed another motion with the same title as the first and an amended version—both of which do not differ in substance from the one filed on May 26.  In these motions, Walls argued that his death

_____

manifested itself prior to age 18.  Fla. R. Crim. P. 3.203; see also § 921.137, Fla. Stat. (2006).

4. Walls' IQ scores are as follows: 102 at age 12, 101 at age 14, 72 at about age 23, and 74 at approximately age 40.

sentence was unconstitutional under <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), because the United States Supreme Court's decision in <u>Hall v. Florida</u>, 134 S. Ct. 1986 (2014), changed the definition of subaverage intellectual functioning to now include IQ scores that are 75 or below. Because Walls' intellectual disability hearing was directed at satisfying the unconstitutional definition of an IQ that is 70 or below, Walls requested a new hearing.

The circuit court held a hearing on July 6, 2015, intending to conduct a case management conference, under <u>Huff v. State</u>, 622 So. 2d 982 (Fla. 1993), to decide whether an evidentiary hearing was necessary on Walls' motion. However, Walls' counsel, Harry Brody, informed the court that he was not prepared to argue the motion and was intending to withdraw from Walls' case due to his current retired status among other issues. The State argued that because the circuit court was required to conduct the <u>Huff</u> hearing within ninety days of when the State filed its answer to the 3.851 motion—which was filed on June 12, 2015—the court should hear argument as to that issue only and require Brody to file a separate motion to withdraw.

As to the <u>Huff</u> issue, the State then asserted that the court could summarily deny Walls' motion as a matter of law because even with the new cut-off of 75, Walls was required to demonstrate onset before age 18 and none of his IQ scores from before he turned 18 were below 75. In response, Brody presented limited

argument explaining that in his opinion, Hall expressly rejected such a rigid approach and instead required courts to look at other aspects of a defendant's background, rather than just an IQ score. The court then ended the hearing, stating it would issue its ruling in writing, and requested that Brody move forward with filing his motion to withdraw.

On July 10, 2015, the circuit court issued its order summarily denying Walls' second successive 3.851 motion without granting a hearing. The court did not expressly rule on whether Hall applied retroactively to Walls' case, stating that although the Eleventh Circuit Court of Appeals had opined that Hall does not have retroactive application,[5] the procedural history of Haliburton v. State, 163 So. 3d 509 (Fla. 2015) (table), at least implicitly gives retroactive application to Hall.[6] However, the circuit court found that even if Hall were to apply, Walls would not be entitled to relief because his only IQ scores below 75 were received after he had turned 18: his scores were 102 at age 12, 101 at age 14, 72 at about age 23, and 74 at about age 40. Accordingly, the court found that Walls could not demonstrate

5. See In re Hill, 777 F.3d 1214, 1223 (11th Cir. 2015); In re Henry, 757 F.3d 1151, 1159 (11th Cir. 2014).

6. In Haliburton v. Florida, 135 S. Ct. 178 (2014), the United States Supreme Court remanded the defendant's intellectual disability claim to this Court for reconsideration in light of Hall. On remand, this Court remanded to the trial court for an evidentiary hearing under rule 3.203. Haliburton, 163 So. 3d at 509.

subaverage intellectual functioning that manifested prior to age 18. In addition, the circuit court found that Walls had already received the relief Hall allows because Walls had had the benefit of an earlier hearing at which he presented evidence regarding all three prongs of the test for intellectual disability. Thus, the court found he was not entitled to another evidentiary hearing, despite the new interpretation from Hall. Walls now appeals from the circuit court's denial of relief, arguing that the circuit court erred in (1) summarily denying the claim and (2) ruling that Walls' intellectual disability did not manifest before age 18. Due to our ruling on the first of these two issues, we find it unnecessary to address the second issue.

## ANALYSIS

Walls' postconviction motion is based on his prior evidentiary hearing having been decided under a rule of law that has now been found unconstitutional under the Supreme Court's decision in Hall. If Hall does not apply retroactively, Walls has no basis on which to claim relief. Therefore, we address the retroactivity of Hall first.

## I. Retroactive Application of Hall

In Hall, the United States Supreme Court declared Florida's definition of intellectual disability unconstitutional because it required an IQ score of 70 or below to demonstrate subaverage intellectual functioning. See 134 S. Ct. at 1990.

- 10 -

Prior to the decision in Hall, a Florida defendant with an IQ score above 70 could not be deemed intellectually disabled and, therefore, was barred from presenting evidence regarding the other two prongs of the test for intellectual disability: adaptive functioning deficits and manifestation before age 18. Id. at 1994. This was true despite the medical community considering evidence of these other two prongs to be probative of intellectual disability even for individuals whose IQ scores were above 70. Id. The Supreme Court found that the mandatory IQ cutoff of 70 violated established medical practices in two ways: first, by taking "an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence," and second, by relying on a "purportedly scientific measurement of the defendant's abilities"—his IQ score—without recognizing that the measurement itself has an inherent margin of error, resulting in a ranged score rather than a single numerical value. Id. at 1995. The Court also held that the determination of intellectual disability is a "conjunctive and interrelated assessment" such that no single factor can be considered dispositive. Id. at 2001. Accordingly, the Court held that Florida's strict cutoff "creates an unacceptable risk that persons with intellectual disability will be executed" in violation of Atkins and is, therefore, unconstitutional. Id. at 1990.

We must first determine whether Hall warrants retroactive application under Witt v. State, 387 So. 2d 922 (Fla. 1980), before deciding whether Hall applies to

Walls' case. A change in the law will only apply retroactively if the change "(a) emanates from this Court or the United States Supreme Court, (b) is constitutional in nature, and (c) constitutes a development of fundamental significance." Id. at 931. Developments of fundamental significance are likely to fall within one of two categories: changes of law that either "place beyond the authority of the state the power to regulate certain conduct or impose certain penalties" or are "of sufficient magnitude to necessitate retroactive application" under the retroactivity test of Stovall v. Denno, 388 U.S. 293, 297 (1967), and Linkletter v. Walker, 381 U.S. 618, 636 (1965). Id. at 929. It is without question that the Hall decision emanates from the United States Supreme Court and is constitutional in nature. Thus, we must determine whether Hall constitutes a development of fundamental significance. To do so, we first consider whether it is a change of law that "place[s] beyond the authority of the state the power to regulate certain conduct or impose certain penalties." Id.

The Supreme Court's rejection of Florida's mandatory IQ score cutoff means defendants with IQ scores that are higher than 70 must still be permitted to present evidence of all three prongs of the test for intellectual disability. The Hall decision requires courts to consider all prongs of the test in tandem. As we have recognized, this means that "if one of the prongs is relatively less strong, a finding of intellectual disability may still be warranted based on the strength of the other

- 12 -

prongs." Oats v. State, 181 So. 3d 457, 467-68 (Fla. 2015).  The rejection of the strict IQ score cutoff increases the number of potential cases in which the State cannot impose the death penalty, while requiring a more holistic review means more defendants may be eligible for relief.  Accordingly, the Hall decision removes from the state's authority to impose death sentences more than just those cases in which the defendant has an IQ score of 70 or below.  We find that Hall warrants retroactive application as a development of fundamental significance that places beyond the State of Florida the power to impose a certain sentence—the sentence of death for individuals within a broader range of IQ scores than before.  Cf. Falcon v. State, 162 So. 3d 954, 961-62 (Fla. 2015) (rejecting State's argument that because a Supreme Court decision only invalidated a statute as applied to a specific subgroup of people, the decision was only a procedural refinement such that retroactive application was unnecessary).  Finding that Hall does apply retroactively, we next address the merits of Walls' appeal.

## II.  Applying Hall to This Case

In applying Hall to Florida, we have recognized the Supreme Court's mandate that all three prongs of the intellectual disability test be considered in tandem and that the conjunctive and interrelated nature of the test requires no single factor to be considered dispositive.  Oats, 181 So. 3d at 459, 467 (citing Hall, 134 S. Ct. at 2001; Brumfield v. Cain, 135 S. Ct. 2269, 2278-82 (2015)).

- 13 -

Reviewing this case, it is clear that although Walls has had an earlier evidentiary hearing as to intellectual disability and was allowed to present evidence of all three prongs of the test, he did not receive the type of holistic review to which he is now entitled. Also, Walls' prior hearing was conducted under standards he could not meet because he did not have an IQ score below 70—a fact which may have affected his presentation of evidence at the hearing. Because Walls' prior evidentiary hearing was directed toward satisfying the former definition of intellectual disability and was reviewed by the circuit court with the former IQ score cutoff rule in mind, we remand for the circuit court to conduct a new evidentiary hearing as to Walls' claim of intellectual disability.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
PARIENTE, J., concurs with an opinion.
PERRY, J., concurs in result.
CANADY, J., dissents with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring.

I fully concur in the majority opinion that Walls is entitled to a new evidentiary hearing pursuant to Hall v. Florida, 134 S. Ct. 1986, 1990 (2014). I write separately to express my belief that to fail to give Walls the benefit of Hall, which disapproved of Cherry v. State, 959 So. 2d 702 (Fla. 2007), would result in a

manifest injustice, which is an exception to the law of the case doctrine. In State v.

Owen, this Court held that it has the power to reconsider and correct erroneous

rulings in exceptional circumstances, where reliance on the previous decision

would result in manifest injustice, notwithstanding that such rulings have become

the law of the case. 696 So. 2d 715, 720 (Fla. 1997). The Owen Court also held

that an intervening decision by a higher court is one of the exceptional situations

that this Court will consider when entertaining a request to modify the law of the

case. Id.

Contrary to the dissent's suggestions, this Court appropriately holds that

Hall should be given retroactive effect. See Canady, J., dissenting op. at 22. The

decision is not a mere evolutionary refinement in the law. Hall specifically held

that Florida's method for determining those who are ineligible for execution

violates the Eighth Amendment:

> The Florida statute, as interpreted by its courts, misuses IQ
> score on its own terms; and this, in turn, bars consideration of
> evidence that must be considered in determining whether a defendant
> in a capital case has an intellectual disability. Florida's rule is invalid
> under the Constitution's Cruel and Unusual Punishment Clause.

Hall, 134 S. Ct. at 2001.

Moreover, as this Court explained in Oats v. State, Hall changed the manner

in which evidence of intellectual disability must be considered, stating: "[C]ourts

must consider all three prongs in determining an intellectual disability, as opposed

- 15 -

to relying on just one factor as dispositive . . . because these factors are interdependent, if one of the prongs is relatively less strong, a finding of intellectual disability may still be warranted based on the strength of the other prongs." Oats, 181 So. 3d 457, 467-68 (Fla. 2015).

Militating against the "ongoing threat of major disruption to the application of the death penalty resulting from giving retroactive effect to Hall," not all capital defendants will be entitled to relief under Hall. See Canady, J., dissenting op. at 7. As this Court determined in an unpublished Order in the case of Rodriguez v. State, those defendants who did not timely raise a claim under Atkins v. Virginia, 536 U.S. 304 (2002), and pursuant to Florida Rule of Criminal Procedure 3.203, should not be entitled to relief under Hall. Rodriguez, No. SC15-1278 (Fla. Aug. 9, 2016). In that order, we stated:

> Rodriguez, who had never before raised an intellectual disability claim, asserted that there was "good cause" pursuant to Rule 3.203(f) for his failure to assert a previous claim of intellectual disability and only after the United States Supreme Court decided Hall v. Florida, 134 S. Ct. 1986 (2014), did he have the basis for asserting an intellectual disability claim. The trial court rejected the motion as time barred, concluding there was no reason that Rodriguez could not have previously raised a claim of intellectual disability based on Atkins v. Virginia, 536 U.S. 304 (2002). The trial court further concluded that Rodriguez could not have relied on Cherry v. State, 959 So. 2d 702 (Fla. 2007), which established the bright-line cut-off of 70 for IQ scores disapproved of in Hall, because he never raised an intellectual disability claim after Atkins as required by Rule 3.203.
> We have considered the issues raised, and affirm the trial court's denial of Rodriguez's motion as time-barred for the reasons stated by the trial court.

<u>Id.</u>

Turning to this case, the trial court relied, in part, on this Court's decision in <u>Cherry</u> in denying Walls relief. The bright-line cut-off of 70 for IQ scores announced in <u>Cherry</u> and relied on by the trial court in Walls' case has been explicitly rejected by the United States Supreme Court's decision in <u>Hall</u>. <u>Hall</u>, 134 S. Ct. at 2000. Specifically, the trial court in this case denied Walls relief on his intellectual disability claim because Walls' lowest IQ score of 72 did not meet the definition of subaverage intellectual functioning, as interpreted by <u>Cherry</u>. <u>See</u> majority op. at 7. This Court affirmed the trial court's decision, finding "no evidence that Walls has ever had an IQ of 70 or below." <u>Walls v. State</u> (<u>Walls IV</u>), 3 So. 3d 1248 (Fla. 2008).

Because Walls' eligibility or ineligibility for execution must be determined in accordance with the correct United States Supreme Court jurisprudence, this case is a prime example of creating a manifest injustice if we did not apply <u>Hall</u> to Walls. Walls has yet to have "a fair opportunity to show that the Constitution prohibits [his] execution." <u>Hall</u>, 134 S. Ct. at 2001. "Uniquely, capital punishment . . . connotes special concern for individual fairness because of the possible imposition of a penalty as unredeeming as death." <u>Witt v. State</u>, 387 So. 2d 922, 326 (Fla. 1980).

- 17 -

More than fundamental fairness and a clear manifest injustice, the risk of executing a person who is not constitutionally able to be executed, trumps any other considerations that this Court looks to when determining if a subsequent decision of the United States Supreme Court should be applied. At stake in this case is a principle that could not be better expressed than in the words of Justice Kennedy writing for the majority in Hall:

> The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution. Florida's law contravenes our Nation's commitment to dignity and its duty to teach human decency as the mark of a civilized world. The States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects.

134 S. Ct. at 2001. For all these reasons, I concur with the majority opinion that Walls is entitled to a new evidentiary hearing pursuant to the United States Supreme Court's decision in Hall.

CANADY, J., dissenting.

The trial court's order denying Walls' claim should be affirmed. In reversing the trial court's order, the majority makes three fundamental errors. First, the majority ignores a deficiency in Walls' case—his failure to show juvenile onset—that bars him from success on his claim of intellectual disability. Second, the decision here goes on needlessly to consider Hall v. Florida, 134 S. Ct. 1986

- 18 -

(2014), and in the process misconstrues the holding in <u>Hall</u>.  Third, the Court

erroneously concludes that <u>Hall</u> should be given retroactive application.

## I.

This case is easily resolvable without any discussion of the scope of <u>Hall</u>'s

holding regarding IQ scores or consideration of whether <u>Hall</u> should be applied

retroactively.  The trial court correctly denied Walls' intellectual disability claim

because the evidence showed without dispute that as a juvenile Walls had IQ

scores of 102 (at age 12) and 101 (at age 14).  Based on these IQ scores, Walls

could not establish that he met the third prong of the test for intellectual disability,

which requires that the condition be "manifested during the period from conception

to age 18."  § 921.137(1), Fla. Stat. (2006).  This requirement of juvenile onset was

not at issue and played no part in the Court's analysis in <u>Hall</u>.  So nothing in <u>Hall</u>

supports the conclusion that the third prong does not remain a valid requirement of

law.  The third prong therefore defeats Walls' claim.  And the trial court's rejection

of the claim on that basis should be affirmed.

## II.

The majority states that <u>Hall</u> requires that "defendants with IQ scores that

are higher than 70 must still be permitted to present evidence of all three prongs of

the test for intellectual disability."  Majority op. at 12.  According to the majority,

<u>Hall</u> requires that "no single factor . . . be considered dispositive" but that every

- 19 -

intellectual disability claim must instead be given "holistic review." Majority op. at 11, 13, 14. Thus, by the reasoning of the majority, an individual with an IQ of 80, 100, 125, or 150 would nonetheless—as part of the "holistic review" process— be entitled to present evidence of adaptive deficits to establish intellectual disability. But this is not consistent with what the Supreme Court actually decided in Hall.

Hall declared unconstitutional Florida's "rigid rule" "defin[ing] intellectual disability to require an IQ test score of 70 or less"—a rule that failed to take into account the 5-point standard error of measurement (SEM) for IQ tests. Hall, 134 S. Ct. at 1990. The Court was crystal clear concerning the question at issue: "That strict IQ score cutoff of 70 is the issue in this case." Id. at 1994. In line with that statement of the issue, the Court noted that "Petitioner does not question the rule in States which use a bright-line cutoff at 75 or greater." Id. at 1996. Therefore, contrary to the majority's mandate of "holistic review," nothing in Hall calls into question the statutory provision that intellectual disability can be established only if a person suffers from "significantly subaverage general intellectual functioning," which "means performance that is two or more standard deviations from the mean score on a standardized intelligence test." § 921.137(1). That threshold, independent requirement should not be cast aside in the name of "holistic review." Contrary to the majority's reasoning, Hall recognizes that the existence of an IQ

score evidencing significantly subaverage general intellectual functioning is a threshold requirement for determining whether an individual is intellectually disabled: "For professionals to diagnose—and for the law then to determine—whether an intellectual disability exists <u>once the SEM applies and the individual's IQ score is 75 or below</u> the inquiry would consider factors indicating whether the person had deficits in adaptive functioning." <u>Hall</u>, 134 S. Ct. at 1996 (emphasis added).

The holding of <u>Hall</u> is that the SEM must be taken into account in determining whether an individual is intellectually disabled. Throughout its opinion, the Court in <u>Hall</u> focuses on Florida's failure to consider the SEM. And the Court repeatedly identifies that failure as the basis for its decision. The Court observed that "[t]he clinical definitions of intellectual disability, which take into account that IQ scores represent a range, not a fixed number, were a fundamental premise of <u>Atkins</u>[ v. Virginia, 536 U.S. 304 (2002),]" and that "those clinical definitions have long included the SEM." <u>Id.</u> at 1999. The Court went on to state that "[b]y failing to take into account the SEM and setting a strict cutoff at 70, Florida 'goes against the unanimous professional consensus.' APA Brief 15." <u>Id.</u> at 2000. In line with that consensus, the Court announced its "independent assessment that an individual with an IQ test score 'between 70 and 75 or lower,' <u>Atkins</u>, <u>supra</u>, at 309, n.5, 122 S. Ct. 2242, may show intellectual disability by

presenting additional evidence regarding difficulties in adaptive functioning." Id. Thus, the Court "agree[d] with the medical experts that when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id. at 2001. The Court reiterated: "By failing to take into account the standard error of measurement, Florida's law not only contradicts the test's own design but also bars an essential part of a sentencing court's inquiry into adaptive functioning." Id. So when an individual's IQ score is determined to be greater than 75—and the SEM thus has been taken into account—the holding of Hall has no bearing on the case.

## III.

I reject the majority's conclusion that Hall should be given retroactive application under Witt v. State, 387 So. 2d 922 (Fla. 1980), "as a development of fundamental significance that places beyond the State of Florida the power to impose a certain sentence." Majority op. at 13. Contrary to the majority's reasoning, Hall places no categorical limitation on the authority of the state to impose a sentence of death. Hall requires that the SEM of IQ tests be considered, but it does not preclude death sentences for individuals whose scores fall within the SEM. Although Hall's IQ score fell within the SEM, the Court recognized that his score was not sufficient to establish that he was intellectually disabled: "Freddie

Lee Hall may or may not be intellectually disabled, but the law requires that he have the opportunity to present evidence of his intellectual disability, including deficits in adaptive functioning over his lifetime." Hall, 134 S. Ct. at 2001; see also In re Henry, 757 F.3d 1151, 1161 (11th Cir. 2014) (holding in the context of federal habeas corpus review that Hall has no retroactive effect because it does not articulate a "rule placing a class of individuals beyond the state's power to execute" but "merely provides new procedures for ensuring that States do not execute members of an already protected group").

I would also conclude that Hall is not a change in the law of "fundamental significance" under the Stovall/Linkletter[7] test adopted in Witt for determining "changes of law which are of sufficient magnitude to necessitate retroactive application." Witt, 387 So. 2d at 929, 931. This test recognizes

> that the essential considerations in determining whether a new rule of law should be applied retroactively are essentially three: (a) the purpose to be served by the new rule; (b) the extent of reliance on the old rule; and (c) the effect on the administration of justice of a retroactive application of the new rule.

Id. at 926. In Witt, the Court recognized that under this test "evolutionary refinements"—in contrast to "jurisprudential upheavals"—do not warrant retroactive application:

---

7. Stovall v. Denno, 388 U.S. 293 (1967); Linkletter v. Walker, 381 U.S. 618 (1965).

- 23 -

In contrast to these jurisprudential upheavals are evolutionary refinements in the criminal law, affording new or different standards for the admissibility of evidence, for procedural fairness, for proportionality review of capital cases, and for other like matters. Emergent rights in these categories, or the retraction of former rights of this genre, do not compel an abridgement of the finality of judgments. To allow them that impact would, we are convinced, destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit.

Id. at 929-30. Hall represents just such an evolutionary refinement in the law. I thus would conclude that Hall should not be given retroactive effect under the Stovall/Linkletter test based on (a) Hall's purpose of adjusting at the margin the definition of IQ scores that evidence significant subaverage intellectual functioning, (b) the State's reliance on Cherry's[8] holding in numerous cases over an extended period of time, and (c) the ongoing threat of major disruption to application of the death penalty resulting from giving retroactive effect to Hall as well as similar future changes in the law regarding aspects of the definition of intellectual disability.

Finally, I would conclude that Hall does not constitute "a new substantive rule of constitutional law" for which federal law requires retroactive application.

---

8. Cherry v. State, 959 So. 2d 702, 712-13 (Fla. 2007) (holding that SEM need not be taken into account), cert. denied, 552 U.S. 993 (2007), abrogated by Hall v. Florida, 134 S. Ct. 1986 (2014).

Montgomery v. Louisiana, 136 S. Ct. 718, 729 (2016). The Supreme Court has explained this category of substantive rules that must be given retroactive effect:

> Substantive rules, then, set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose. It follows that when a State enforces a proscription or penalty barred by the Constitution, the resulting conviction or sentence is, by definition, unlawful. Procedural rules, in contrast, are designed to enhance the accuracy of a conviction or sentence by regulating "the manner of determining the defendant's culpability." Schriro[ v. Summerlin, 542 U.S. 348, 353 (2004)]; Teague[ v. Lane, 489 U.S. 288, 313 (1989) (plurality opinion)]. Those rules "merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise." Schriro, supra, at 352. Even where procedural error has infected a trial, the resulting conviction or sentence may still be accurate; and, by extension, the defendant's continued confinement may still be lawful. For this reason, a trial conducted under a procedure found to be unconstitutional in a later case does not, as a general matter, have the automatic consequence of invalidating a defendant's conviction or sentence.

Id. at 729-30. The Court thus has recognized that retroactive application is appropriate because the "possibility of a valid result does not exist where a substantive rule has eliminated a State's power to proscribe the defendant's conduct or impose a given punishment." Id. at 730; see also Welch v. United States, 136 S. Ct. 1257, 1266 (2016) ("[T]he Court has adopted certain rules that regulate capital sentencing procedures in order to enforce the substantive guarantees of the Eighth Amendment. The consistent position has been that those rules are procedural, even though their ultimate source is substantive.").

In explaining why states should be required to give retroactive effect to such new substantive rules, the Court stated:

> [T]he retroactive application of substantive rules does not implicate a State's weighty interests in ensuring the finality of convictions and sentences. Teague warned against the intrusiveness of "continually forc[ing] the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards." 489 U.S., at 310. This concern has no application in the realm of substantive rules, for no resources marshaled by a State could preserve a conviction or sentence that the Constitution deprives the State of power to impose.

Montgomery, 136 S. Ct. at 732.

The change in the law accomplished by Hall does not render any sentence "by definition, unlawful." Id. at 730. Hall "merely raise[s] the possibility" that someone found not to be intellectually disabled could be determined to be intellectually disabled. Id. (quoting Schriro, 542 U.S. at 352). And if Hall is given retroactive application, the state will most certainly be required to "marshal resources" to sustain death sentences that have been imposed. Id. at 732 (quoting Teague, 489 U.S. at 310). The rule adopted by Hall therefore is not a substantive rule that is required to be given retroactive effect under federal law.

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Okaloosa County,
    William Francis Stone, Judge - Case No. 461987CF000856XXXAXX

Billy H. Nolas, Chief, Capital Habeas Unit, Office of the Federal Public Defender, Northern District of Florida, Tallahassee, Florida; and Baya Harrison, III, Special

Assistant, Capital Collateral Regional Counsel – Middle Region, Monticello, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, and Charmaine Millsaps, Assistant Attorney General, Tallahassee, Florida; and Sandra Sue Jaggard, Assistant Attorney General, Miami, Florida,

for Appellee