# Supreme Court of Florida

_____

No. SC17-2198
_____

**JERMAINE FOSTER,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

December 28, 2018

PER CURIAM.

This case is before the Court on appeal from an order denying a successive motion to vacate two sentences of death under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. Foster contends that the postconviction court erred in summarily denying the three claims raised in his motion. The first claim is one of intellectual disability, raised pursuant to the United States Supreme Court's decision in *Hall v. Florida*, 572 U.S. 701 (2014), and the second and third claims seek relief pursuant to *Hurst v. Florida*, 136 S. Ct. 616 (2016), and this Court's decision on remand in *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017). For the reasons explained below,

we reverse the denial of the *Hall* claim and remand for an evidentiary hearing, but we affirm the denial of *Hurst* relief.

## FACTS AND PROCEDURAL BACKGROUND

Foster was convicted of the first-degree murders of Anthony Clifton and Anthony Faiella and sentenced to death for each of the murders. *Foster v. State*, 679 So. 2d 747, 750-51 (Fla. 1996) (*Foster I*).[1] These convictions arose out of events that occurred at the end of a crime spree in which Foster and three other males (Gerard Booker, Leondra Henderson, and Alf Catholic) participated. *Id*. We have described the facts of the crimes as follows:

> On the morning of November 28, 1993, Gerard Booker came to the trailer shared by [Jermaine] Foster and Leondra Henderson and stated he wanted to recoup his recent gambling losses by committing robberies. The trio proceeded to Auburndale to a place called "The Hill." Armed with a .38 caliber handgun, a .9 millimeter handgun, and an Uzi-type automatic weapon, Foster and Booker, who were joined by Alf Catholic, approached three unknown men who were selling drugs from their truck. After forcing the victims to remove their clothing and lie on the ground, Foster, Catholic, and Booker stole the victims' cash, jewelry, crack cocaine, and red Ford pickup truck. Henderson then joined the group, and they [left the scene to] conceal[] the stolen truck for future use.
> Foster and Catholic returned to The Hill and sold some of the stolen drugs; however, the proceeds of the robbery were not sufficient to cover Booker's gambling losses. The group of Foster, Catholic, Booker, and Henderson agreed to find a local drug dealer and rob him.

---

1. In the same case, Foster was convicted of and sentenced for the attempted first-degree murder of Mike Rentas and four counts of kidnapping for kidnapping the above-mentioned victims and their companion, Tammy George. *Foster I*, 679 So. 2d at 750-51. However, only the death sentences are at issue in this appeal.

Then they retrieved the stolen red truck and loaded the guns [they had used in] the earlier robbery into it. When the group was unable to locate their intended victim, they drove to Osceola County to visit a girlfriend of Catholic and to find other victims to rob.

At the girlfriend's house, the group decided to accompany the girlfriend and some of her friends to the Palms Bar in St. Cloud. Catholic and Foster rode in the car driven by Catholic's girlfriend, and Henderson and Booker followed in the stolen red truck. Both drivers stopped their vehicles in route to the bar, and Catholic's girlfriend bought some liquor. Testimony revealed that Foster and Catholic drank liquor and smoked marijuana during the trip. Then the two drivers pulled over so the girlfriend could buy some gas. It was determined at that time that there were problems with the truck's fan belt, which had caused the truck to overheat and smoke during the trip. Booker stated that they would have to steal another car in which to return home that night.

Once at the Palms Bar, Foster and Catholic drank liquor, and Foster played a video game and danced. After a while, the group went outside, and Booker detailed a plan to rob the entire bar. Foster told Booker the plan was "crazy" because it was unknown what "those boys got in there." As the group headed back into the bar, Henderson noticed a black Nissan Pathfinder that was in the parking lot. Henderson determined that Anthony Faiella and Mike Rentas had come to the bar in that vehicle. . . . Faiella and Rentas came to the bar to meet Anthony Clifton, who was with Tammy George. Henderson pointed out Faiella, Rentas, and Clifton to Booker as possible victims to rob of their money and their vehicle. The group decided upon a plan to follow the potential victims when they left the bar in the Pathfinder. Foster told Henderson, Booker, and Catholic that if the victims did not have any money, he was going to kill them.

At around 1:30 a.m., Faiella, Rentas, Clifton, and George left the bar in the Pathfinder. The other group followed them in the red truck. Catholic was driving the truck and rammed into the back of the Pathfinder to get that vehicle to stop. When the victims stopped and got out of the Pathfinder to inspect the damage, the group in the red truck took out their weapons and demanded money from the occupants of the Pathfinder. After the victims stated that they did not have any money, the victims were forced to return to the Pathfinder. Booker drove the Pathfinder, and Henderson held the victims at gunpoint from the passenger seat. The others followed in the red truck.

On the outskirts of Kissimmee, the red truck again began experiencing mechanical problems. Catholic turned off the main highway and drove a short distance into a vacant field; Booker and the victims followed in the Pathfinder. All four of the victims were ordered out of the Pathfinder, and Tammy George was separated from the three male victims. The group again demanded money from the male victims. When these victims did not produce any, they were ordered to remove their clothes, and Foster had the men place their underwear and hands on their heads and lie face down on the ground.

At this point, Foster, from a position beside and to the rear of Anthony Clifton, shot Clifton in the back of the head, killing him. Foster then approached Rentas and fired at his head. The bullet hit him in the hand, and Rentas pretended to be dead. Foster next walked to Faiella and shot him in the head, killing him. After this, Foster approached George as if to kill her, but Booker talked him out of it.

*Id*.

After a penalty phase, Foster's jury unanimously recommended that Foster be sentenced to death for each of the two murders. *Id*. at 751. The trial court followed this recommendation, finding four statutory aggravators[2] and one statutory mitigator.[3] In conjunction with the statutory mitigator, the trial court found that Foster is "mildly mentally retarded," *id*. at 755, based on evidence that

---

2. The trial court found the following aggravators: Foster was previously convicted of another capital felony; the capital felony was committed while the defendant was engaged in the commission of a kidnapping; the capital felony was committed for pecuniary gain; and the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. *Foster I*, 679 So. 2d at 751 n.2.

3. As the statutory mitigator, the trial court found that Foster's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. *Id*. at 751 n.3.

Foster had an IQ score of 75 and showed deficits in adaptive functioning. However, at that time, "mental retardation," which is now known as intellectual disability,[4] was not a bar to execution. *See Penry v. Lynaugh*, 492 U.S. 302, 340 (1989). This Court affirmed Foster's convictions and sentences on direct appeal. *Foster I*, 679 So. 2d at 756.[5]

Thereafter, Foster filed his initial motion for postconviction relief and was permitted to amend and supplement it. Among the claims raised was ineffective assistance of trial counsel for failure to present a voluntary intoxication defense and, in support of that defense, to put on evidence of the enhanced effect

---

4. The two terms are used interchangeably in this opinion to the extent of leaving the quotations from the record and case law unaltered when the former term is used.

5. Foster raised the following issues on direct appeal: (1) the death penalty is disproportionate; (2) the trial court improperly balanced the aggravators against the mitigators; (3) the trial court erred in denying Foster's motion for mistrial based on the wrongful admission of hearsay evidence over objection; (4) the trial court erred by allowing witnesses to testify about other crimes or bad acts; (5) the trial court erred in excusing a juror for cause over defense objection; (6) the trial court erred in instructing the jury that it could consider whether the murder was heinous, atrocious, or cruel; (7) the trial court erred in refusing to strike jurors for cause; (8) the trial court erred in finding that the murders were committed in a cold, calculated, and premeditated manner; (9) the trial court erred in overruling objections to the introduction of racial prejudice into the proceedings; (10) the trial court erred in considering separately that the murder was for pecuniary gain and that the murder occurred during the course of a kidnapping; (11) a new trial is warranted because of prosecutorial misconduct; and (12) section 921.141, Florida Statutes (1993), is unconstitutional. *Foster I*, 679 So. 2d at 751 n.4.

intoxicating substances would have had on him due to his intellectual disability.

*Foster v. State*, 929 So. 2d 524, 527-28 (Fla. 2006) (*Foster II*).[6] The

postconviction court held a hearing on the motion and denied it. *Id.*

Between the evidentiary hearing and the date the postconviction court

denied Foster's initial postconviction motion, the United States Supreme Court

issued *Atkins v. Virginia*, 536 U.S. 304 (2002), imposing a bar to the execution of

individuals with intellectual disability, and *Ring v. Arizona*, 536 U.S. 584 (2002),

---

6. Foster raised the following claims in his amended motion for postconviction relief: (1) Foster's trial counsel was ineffective for failing to adequately investigate and prepare for the case; (2) Foster's trial counsel was ineffective for not providing evidence relating to Foster's mental health to the jury; (3) Foster's trial was compromised by procedural and substantive errors; (4) Foster's trial counsel was ineffective for failing to object to the trial court's finding that the murders were committed in a cold, calculated, and premeditated manner; (5) the jury received inadequate guidance from the court regarding the aggravators to be considered; (6) prejudicial pretrial publicity denied Foster's right to an impartial trial; (7) the penalty phase jury instructions unconstitutionally shifted the burden to Foster; and (8) Foster's counsel was ineffective because the court failed to instruct the jury regarding the statutory mitigator regarding the crime being committed while Foster was under extreme mental disturbance. *Foster II*, 929 So. 2d at 527. Foster later filed a supplemental motion alleging an additional claim, that his trial counsel was ineffective for failing to investigate a voluntary intoxication defense in conjunction with his intellectual disability. *Id.* at 528. In addition to the supplemental motion, which was accepted by the postconviction court, Foster moved for leave to amend his motion to include a claim regarding an alleged racial slur by his counsel and a statement that mitigation was useless. *Id.* The postconviction court denied the motion for leave to amend. *Id.* However, during the appeal from the denial of Foster's motion, this Court relinquished jurisdiction for an evidentiary hearing on the claim concerning the alleged racial slur, and the postconviction court ultimately denied the claim on the merits. *Id.*

setting forth the requirement that all facts necessary to render a person eligible for the death penalty be found by a jury. During the rehearing period for the denial of Foster's initial motion for postconviction relief, Foster raised claims under both of these decisions. The postconviction court denied the claims on the merits. *Foster II*, 929 So. 2d at 531-32. Foster then appealed from the denial of his motion for postconviction relief, including the *Atkins* and *Ring* claims, and this Court affirmed the denial of each claim. *Id*. at 531-33, 537.

Foster later filed the successive postconviction motion at issue in this appeal, raising three claims. As noted at the outset, the first claim is that Foster is intellectually disabled and therefore ineligible for the death penalty under *Hall v. Florida*, which invalidated this state's prior position that a person who cannot produce an IQ test score of 70 or below does not qualify as intellectually disabled, 134 S. Ct. at 1990, and case law applying that decision. The second and third claims seek relief in light of *Hurst v. Florida* and *Hurst v. State*. The postconviction court summarily denied each claim, and Foster now appeals those rulings.

**INTELLECTUAL DISABILITY**

A claim of intellectual disability as a bar to execution requires the defendant to establish three prongs: "(1) significantly subaverage general intellectual functioning, (2) concurrent deficits in adaptive behavior, and (3) manifestation of

the condition before age eighteen." *Salazar v. State*, 188 So. 3d 799, 811 (Fla. 2016). As noted above, this state formerly required proof of an IQ score of 70 or below to establish the first prong, and failure to produce such evidence was fatal to the entire claim. *Hall*, 134 S. Ct. at 1990; *see, e.g.*, *Cherry v. State*, 959 So. 2d 702, 712-13 (Fla. 2007). In *Hall*, the United States Supreme Court determined that this approach "creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional." 134 S. Ct. at 1990. We have explained the crux of the *Hall* decision as follows:

> Prior to the decision in *Hall*, a Florida defendant with an IQ score above 70 could not be deemed intellectually disabled and, therefore, was barred from presenting evidence regarding the other two prongs of the test for intellectual disability: adaptive functioning deficits and manifestation before age 18. *Id.* at 1994. . . . The Supreme Court found that the mandatory IQ cutoff of 70 violated established medical practices in two ways: first, by taking "an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence," and second, by relying on a "purportedly scientific measurement of the defendant's abilities"—his IQ score—without recognizing that the measurement itself has an inherent margin of error, resulting in a ranged score rather than a single numerical value. *Id.* at 1995. The Court also held that the determination of intellectual disability is a "conjunctive and interrelated assessment" . . . . *Id.* at 2001.[7]

---

7. Although this sentence in *Walls* ends with a suggestion that "no single factor can be considered dispositive," we have since clarified that, even after *Hall*, a failure to prove any one prong of the intellectual disability test is a failure to prove the claim. *Quince v. State*, 241 So. 3d 58, 62 (Fla. 2018); *Williams v. State*, 226 So. 3d 758, 773 (Fla. 2017) (citing *Salazar*, 188 So. 3d at 812). Thus, while an assessment of intellectual disability involves "conjunctive and interrelated" factors, *Hall*, 134 S. Ct. at 2001, if a defendant cannot produce an IQ score that shows significantly subaverage intellectual functioning even when the standard

*Walls v. State*, 213 So. 3d 345-46 (Fla. 2016).

When the original postconviction court denied Foster's *Atkins* claim, it considered the evidence presented in Foster's trial and in the evidentiary hearing on the postconviction claim that Foster's trial counsel was ineffective for failure to present a voluntary intoxication defense and, in support of that defense, to put on evidence of the enhanced effect intoxicating substances would have had on him due to his intellectual disability. This was the hearing held prior to the Supreme Court's decision in *Atkins*, during which Foster introduced his IQ score of 75. That record also included some evidence of adaptive deficits, but the trial court found that the record as a whole did not demonstrate that Foster met any of the intellectual disability prongs.

After the United States Supreme Court issued *Hall*, Foster timely filed the successive motion at issue in this appeal, renewing his intellectual disability claim on the basis of *Hall* and this Court's *Hall*-based decision in *Walls v. State*, 213 So. 3d at 346, which held that *Hall* is retroactive. Foster proffered evidence in support of this claim, including affidavits of friends and family concerning adaptive deficits, school records to show adaptive deficits and onset before the age of

---

error of measurement is taken into account, the claim will fail for lack of proof of the first prong. *Quince*, 241 So. 3d at 62.

eighteen, and the expert opinion of Dr. Jethro Toomer, based on these affidavits and records and the earlier assessments, that a diagnosis of intellectual disability is appropriate for Foster. The postconviction court denied Foster's *Hall* claim without an evidentiary hearing, concluding that the claim is procedurally barred because all three prongs of the intellectual disability test have already been considered for Foster. We disagree and hold that Foster is entitled to an evidentiary hearing on his intellectual disability claim for the same reasons that we granted evidentiary hearings in *Walls* and *Franqui v. State*, 211 So. 3d 1026 (Fla. 2017).

Upon review of the record in *Walls*, we determined that, although Walls had previously received consideration of his intellectual disability claim after an evidentiary hearing, the proceedings in that case were not sufficient to show compliance with the "holistic review" required by *Hall* due to the effect the IQ-score cutoff likely had on those proceedings. *Walls*, 213 So. 3d at 346-47. We made the following determinations in that case:

> Walls' prior hearing was conducted under standards he could not meet because he did not have an IQ score below 70—a fact which may have affected his presentation of evidence at the hearing. Because Walls' prior evidentiary hearing was directed toward satisfying the former definition of intellectual disability and was reviewed by the circuit court with the former IQ score cutoff rule in mind, we remand for the circuit court to conduct a new evidentiary hearing as to Walls' claim of intellectual disability.

*Id* at 347. We applied this reasoning in *Franqui*, noting that because Franqui presented IQ scores over 70, "the circuit court may have determined that it was unnecessary to consider or discuss the second and third prongs [of the intellectual disability test] in detail." 211 So. 3d at 1032. Similar reasoning applies to the instant case.

Before *Hall*, Foster's IQ score of 75, the only score that has ever been presented in court, disqualified him as a matter of law from being considered intellectually disabled in Florida. Although the original postconviction court did not cite this standard,[8] its analysis began with skepticism that Foster could be considered intellectually disabled given his achievement of a score of 75 on an IQ test, and the court's consideration of this issue was not aided by any explanation of the standard error of measurement. Also, while the original postconviction court based its decision on Foster's failure to meet the other two prongs of the intellectual disability test, which are not IQ-based, we cannot be sure that its assessment of the evidence was not tainted by a failure to view his IQ score of 75

8. That standard had not been announced by this Court at the time of the original postconviction court's decision, but the standard was driven by the statutory definition of "mental retardation" that was already in effect at that time, *see* § 921.137, Fla. Stat. (2001), and the standard had been announced by the time this Court affirmed the original postconviction court's ruling. *See Zack v. State*, 911 So. 2d 1190, 1201 (Fla. 2005).

in a proper light. Indeed, it appears that the original postconviction court viewed Foster's IQ score of 75 as evidence undermining his claim.

Likewise, Foster is in a position similar to Walls and Franqui with respect to limitations on his presentation of evidence due to the absence of *Hall*'s guidance. At the prior postconviction evidentiary hearing concerning intellectual disability, Foster's counsel was focused on proving that an involuntary intoxication defense would have been enhanced with evidence of intellectual disability, not on proving a claim of intellectual disability as a bar to execution under the governing case law, which was issued after that hearing. He presented evidence of intellectual disability only to show that his drug and alcohol use would have affected him more severely than it would have affected another person with higher intellectual functioning, and he came to the hearing with the background of having received a finding from the trial court that he is mildly intellectually disabled (albeit not a finding based on the *Atkins* prongs). The limitation on Foster's evidentiary presentation is illustrated by the fact that he did not offer any of his school records into evidence, even though the record generated in connection with the motion under review shows that Foster's school records would have afforded favorable, though not conclusive, evidence for Foster. Similarly, he did not include testimony from friends and family who observed adaptive deficits in him as a child, even though the current record includes affidavits showing that this testimony would

- 12 -

have been available. In fact, it includes an attestation from a family member that Foster was in special education, which was not indicated at the original postconviction evidentiary hearing. In consideration of these points and in light of *Hall*, *Walls*, and *Franqui*, we conclude that Foster must now be afforded an opportunity to present evidence of intellectual disability in a proceeding fully informed by *Hall*. *See also Brumfield v. Cain*, 135 S. Ct. 2269, 2281 (2015) (noting that in Brumfield's pre-*Atkins* trial, he "had little reason to investigate or present evidence relating to intellectual disability" and, therefore, the Louisiana court erred in denying him a hearing due to the failure of the record to raise a sufficient doubt about his intellectual functioning).

Although Foster alternatively seeks to forego an evidentiary hearing and requests the imposition of a life sentence based on the trial court's finding in his sentencing order that he is "mildly mentally retarded" and the evidence in the record, that remedy would not be appropriate. Just as Foster has not had a full opportunity to present his evidence in accordance with the applicable legal standards, the State has not had an opportunity to refute it. On the record before us, the proper remedy is a *Hall*-compliant evidentiary hearing.

Accordingly, we reverse the summary denial of this claim and remand for an evidentiary hearing.

## *HURST* CLAIMS

In his two remaining claims, Foster seeks relief from his two sentences of death pursuant to *Hurst v. Florida* and this Court's decision on remand in *Hurst v. State*. Foster is not entitled to relief on these claims. Foster was sentenced to death for each murder following a jury's unanimous recommendation for death. *Foster I*, 679 So. 2d at 751. Foster's sentences of death became final in 1997. *Foster v. Florida*, 520 U.S. 1122 (1997). Thus, *Hurst* does not apply retroactively to Foster's sentences of death. *See Hitchcock v. State*, 226 So. 3d 216 (Fla.), *cert. denied*, 138 S. Ct. 513 (2017). Accordingly, we affirm the denial of these claims.

## CONCLUSION

For the reasons explained above, we reverse the summary denial of Foster's intellectual disability claim and remand for an evidentiary hearing on that claim but affirm the denial of *Hurst* relief.

It is so ordered.

LEWIS, QUINCE, LABARGA, and LAWSON, JJ., concur.
PARIENTE, J., concurs in result with an opinion.
CANADY, C.J., concurs in part and dissents in part with an opinion, in which POLSTON, J., concurs.

NO MOTION FOR REHEARING WILL BE ALLOWED.

PARIENTE, J., concurring in result.

I concur with reversing the postconviction court's denial of Foster's *Hall*[9] claim and remanding for an evidentiary hearing on intellectual disability. I also agree that Foster is not entitled to *Hurst*[10] relief—not because his case was final before *Ring v. Arizona*, 536 U.S. 584 (2002),[11] but because the jury unanimously recommended sentences of death, no aggravating factors were stricken, and Foster did not waive mitigation. *See Davis v. State*, 207 So. 3d 142, 175 (Fla. 2016).

CANADY, C.J., concurring in part and dissenting in part.

I agree that Foster's *Hurst* claim should be rejected. I adhere to the view that *Hurst* should not be given retroactive effect on postconviction review. *See Mosley v. State*, 209 So. 3d 1248, 1285-91 (Fla. 2016) (Canady, J., concurring in part and dissenting in part). And I adhere to the view that when—as here—a jury verdict has established the existence of an aggravator, there is no violation of the requirements of *Hurst v. Florida*, 136 S. Ct. 616 (2016). *See Hurst v. State*, 202 So. 3d 40, 77-82 (Fla. 2016) (Canady, J., dissenting), *cert. denied*, 137 S. Ct. 2161

---

9. *Hall v. Florida*, 572 U.S. 701 (2014).

10. *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017); *see Hurst v. Florida*, 136 S. Ct. 616 (2016).

11. *See* per curiam op. at 14; *see also Hitchcock v. State*, 226 So. 3d 216, 222-23 (Fla.), *cert. denied* 138 S. Ct. 513 (2017) (Pariente, J., dissenting); *Asay v. State* (*Asay V*), 210 So. 3d 1, 32-35 (Fla. 2016), *cert. denied*, 138 S. Ct. 41 (2017) (Pariente, J., concurring in part and dissenting in part).

(2017). So I concur in result regarding the majority's affirmance of the denial of *Hurst* relief.

I dissent from the reversal of the denial of Foster's intellectual disability claim. On that issue, I would affirm the trial court. In my view, *Hall* should not be given retroactive effect on postconviction review. *See Walls v. State*, 213 So. 3d 340, 350-52 (Fla. 2016) (Canady, J., dissenting).

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Orange County,
        Frederick J. Lauten, Judge - Case No. 481993CF012001000AOX

Christopher J. Anderson of Law Office of Christopher J. Anderson, Neptune Beach, Florida; and Billy H. Nolas, Chief, Capital Habeas Unit, Office of the Federal Public Defender, Northern District of Florida, Tallahassee, Florida,

        for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Doris Meacham, Assistant Attorney General, Daytona Beach, Florida,

        for Appellee