# Supreme Court of Florida

_____

No. SC18-1149
_____

**HARRY FRANKLIN PHILLIPS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

May 21, 2020

PER CURIAM.

Harry Franklin Phillips, a prisoner under sentence of death, appeals the circuit court's order summarily denying his successive motion for postconviction relief, which was filed under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

Phillips murdered Bjorn Thomas Svenson in 1982, and his conviction and death sentence for that crime became final in 1998. A postconviction court in 2006 fully adjudicated and denied Phillips's claim that he is intellectually disabled and, under the rule of *Atkins v. Virginia*, 536 U.S. 304 (2002), constitutionally ineligible for the death penalty. We affirmed the denial of Phillips's intellectual disability

claim in 2008. Phillips now seeks yet another determination of his intellectual disability, relying in part on this Court's decision in *Walls v. State*, 213 So. 3d 340 (Fla. 2016), in which we held that the United States Supreme Court's decision in *Hall v. Florida*, 572 U.S. 701 (2014), is retroactive to cases where there has already been a finding that the defendant is not intellectually disabled.

For the reasons we explain, we affirm the circuit court's denial of relief. We also recede from our prior decision in *Walls*.

## I. BACKGROUND

The facts of the case were summarized on direct appeal as follows:

> In the evening of August 31, 1982, witnesses heard several rounds of gunfire in the vicinity of the Parole and Probation building in Miami. An investigation revealed the body of Bjorn Thomas Svenson, a parole supervisor, in the parole building parking lot. Svenson was the victim of multiple gunshot wounds. There apparently were no eyewitnesses to the homicide.
>
> As parole supervisor, the victim had responsibility over several probation officers in charge of appellant's parole. The record indicates that for approximately two years prior to the murder, the victim and appellant had repeated encounters regarding appellant's unauthorized contact with a probation officer. On each occasion, the victim advised appellant to stay away from his employees and the parole building unless making an authorized visit. After one incident, based on testimony of the victim and two of his probation officers, appellant's parole was revoked and he was returned to prison for approximately twenty months.
>
> On August 24, 1982, several rounds of gunfire were shot through the front window of a home occupied by the two probation officers who had testified against appellant. Neither was injured in the incident, for which appellant was subsequently charged.
>
> Following the victim's murder, appellant was incarcerated for parole violations. Testimony of several inmates indicated that

- 2 -

appellant told them he had killed a parole officer. Appellant was thereafter indicted for first-degree murder.

*Phillips v. State*, 476 So. 2d 194, 195-96 (Fla. 1985). Phillips was convicted of the first-degree murder of Svenson and sentenced to death. *Id.* at 197. His conviction and sentence were affirmed on direct appeal, *id.*, but on collateral review, this Court reversed the death sentence and remanded for a new penalty phase based on a finding that counsel was ineffective in the penalty phase, *Phillips v. State*, 608 So. 2d 778 (Fla. 1992). After a new penalty phase in 1994, the jury returned a recommendation of death by a vote of seven to five, and Phillips was again sentenced to death, which was affirmed on appeal. *Phillips v. State*, 705 So. 2d 1320, 1321, 1323 (Fla. 1997), *cert. denied*, 525 U.S. 880 (1998). We later affirmed the denial of Phillips's initial motion for postconviction relief after resentencing and denied his petition for a writ of habeas corpus. *Phillips v. State*, 894 So. 2d 28, 31 (Fla. 2004). And we have affirmed the denial of his prior successive motions for postconviction relief. *Phillips v. State*, 234 So. 3d 547, 548 (Fla.) (affirming denial of successive motion for postconviction relief based on *Hurst v. Florida*, 136 S. Ct. 616 (2016), and *Hurst v. State*, 202 So. 3d 40 (Fla. 2016)), *cert. denied*, 139 S. Ct. 187 (2018); *Phillips v. State*, 91 So. 3d 783 (Fla. 2012) (affirming denial of successive motion for postconviction relief based on the claim that Phillips's sentence violates the Sixth and Eighth Amendments under *Porter v. McCollum*, 558 U.S. 30 (2009)); *Phillips v. State*, 996 So. 2d 859 (Fla.

- 3 -

2008) (affirming denial of successive motion for postconviction relief and denial of motion to interview jurors); *Phillips v. State*, 984 So. 2d 503 (Fla. 2008) (affirming finding that Phillips is not intellectually disabled).

During Phillips's initial postconviction proceedings after resentencing, Phillips filed a "Notice of Supplemental Authority and Motion for Permission to Submit Supplemental Briefing" related to the United States Supreme Court's decisions in *Ring v. Arizona*, 536 U.S. 584 (2002), and *Atkins*, and this Court permitted supplemental briefing on the intellectual disability issues under *Atkins*. *Phillips*, 894 So. 2d at 34. We affirmed the denial of postconviction relief and denied the habeas petition, but regarding his claim of intellectual disability, we noted that "Phillips [was] free to file a motion under rule 3.203" but expressed "no opinion regarding the merits of such a claim." *Id.* at 40. We later relinquished jurisdiction for a determination of intellectual disability pursuant to Florida Rule of Criminal Procedure 3.203. *Phillips*, 984 So. 2d at 506.

At an evidentiary hearing on Phillips's intellectual disability claim in 2006, the circuit court permitted Phillips to present evidence regarding all three prongs of the intellectual disability standard and concluded that Phillips failed to prove by clear and convincing evidence that he met any of the three prongs of the statutory intellectual disability standard (intellectual functioning, adaptive behavior, and onset before age eighteen) and therefore was not intellectually disabled. *Id.* at 509.

- 4 -

In 2008, this Court upheld the circuit court's findings that Phillips failed to establish that he met any of the three prongs and affirmed the denial of relief based on his claim of intellectual disability. *Id.* at 513.

Phillips filed the instant successive motion for postconviction relief in 2018 seeking a new determination of his claim that he is ineligible for the death penalty due to intellectual disability in light of the decisions in *Hall*, *Walls*, and *Moore v. Texas*, 137 S. Ct. 1039 (2017). Phillips contended that the prior denial of his intellectual disability claim must be reheard and determined under new constitutional law that, according to Phillips, requires a court to holistically consider all three prongs of the intellectual disability standard.

At a case management conference held in the circuit court on Phillips's motion, Phillips argued that in light of *Hall* and *Walls*, and a new evaluation report prepared by Dr. Denis Keyes, who had testified at the 2006 hearing, he is entitled to a new evidentiary hearing. Alternatively, Phillips requested that the circuit court reevaluate the evidence presented at the 2006 hearing along with Dr. Keyes's new report, although Phillips conceded that there was no new evidence of intellectual disability in this case and that Dr. Keyes did not change his opinion in his updated report. The circuit court abruptly decided during the case management conference

that it would review de novo the entire record from the 2006 hearing[1] and Dr. Keyes's new report before making any decision on Phillips's motion.

On June 14, 2018, the circuit court entered an order denying an evidentiary hearing and denying relief. But in its 2018 order, the circuit court also made new findings regarding the evidence presented at the 2006 evidentiary hearing. First, it concluded that because *Hall* requires that courts take into account the standard error of measurement (SEM), which is "plus or minus five points" and "[a]n IQ of up to 75 would meet the definition of [intellectual disability]," Phillips "has clearly proven the first prong by clear and convincing evidence," because the IQ scores presented in 2006 were 70, 74, and 75.[2] The circuit court also made a new finding that Phillips met the third prong—onset before age eighteen.[3] Nonetheless, the

---

1. Because it is not germane to our analysis or conclusion today, we make no comment on the propriety of the circuit court's decision to conduct a de novo review of the record of the 2006 evidentiary hearing or of the new credibility determinations it made regarding witnesses who testified in 2006 based on the cold record.

2. In reaching this conclusion, however, the 2018 circuit court ignored the fact that the 2006 circuit court found that because neither of the defense experts performed a complete evaluation that tested for malingering, they were not credible on this prong.

3. But in doing so, the 2018 circuit court either ignored or rejected—without explanation—the finding made by the 2006 circuit court (and affirmed by this Court in 2008) that Phillips failed to establish that he met this prong, and simply concluded instead "that Dr. Keyes['s] testimony from the 2006 hearing is credible and sufficient to prove onset before 18."

2018 circuit court ultimately declined to find that Phillips is intellectually disabled based on its agreement with the 2006 circuit court's finding (and this Court's 2008 opinion affirming that finding) that Phillips failed to establish that he met the second prong of the intellectual disability standard—concurrent deficits in adaptive behavior. Phillips now appeals that decision.

## II. ANALYSIS

First, we review the recent history of intellectual disability as a bar to execution. Then we discuss the clear error in this Court's decision in *Walls* and why *Hall* does not entitle Phillips to relief. Finally, we consider and reject Phillips's claim that he is entitled to relief based on *Moore*.

### A. Intellectual Disability as a Bar to Execution

In 2002, the United States Supreme Court held in *Atkins* that the Eighth and Fourteenth Amendments to the United States Constitution forbid the execution of persons with intellectual disability. *Atkins*, 536 U.S. at 321. The Court observed that "clinical definitions of [intellectual disability] require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id*. at 318. The *Atkins* Court further noted that an IQ between 70 and 75 or lower "is typically considered the cutoff IQ score for the intellectual function prong of the [intellectual disability] definition," *id.* at 309 n.5, but it did not define

- 7 -

subaverage intellectual functioning as having an IQ of 75 or below or mandate that courts take the SEM into account or permit defendants who present a score of 75 or below to present additional evidence of intellectual disability. Instead, the Court explicitly granted states discretion to determine how to comply with its prohibition on execution of the intellectually disabled. *Id.* at 317 ("As was our approach in *Ford v. Wainwright*, 477 U.S. 399 (1986), with regard to insanity, 'we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.' " (alterations in original)).

Under Florida law, " 'intellectual disability' means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." § 921.137(1), Fla. Stat. (2017). "Significantly subaverage general intellectual functioning" is defined as "performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the Agency for Persons with Disabilities." *Id.* "Adaptive behavior" "means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community." *Id.* Thus, to establish intellectual disability as a bar to execution, a defendant must demonstrate (1) significantly subaverage general

intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen.

Until *Hall*, Florida law required that a defendant have an IQ of 70 or below in order to meet the first prong of the intellectual disability standard—significantly subaverage intellectual functioning. *See Cherry v. State*, 959 So. 2d 702, 712-13 (Fla. 2007) ("One standard deviation on the WAIS-III, the IQ test administered in the instant case, is fifteen points, so two standard deviations away from the mean of 100 is an IQ score of 70. As pointed out by the circuit court, the statute does not use the word approximate, nor does it reference the SEM. Thus, the language of the statute and the corresponding rule are clear."), *abrogated by Hall*, 572 U.S. 701. Thus, a defendant was required to present an IQ score of 70 or below in order to establish the first prong of the intellectual disability standard. Failure to present the requisite IQ score precluded a finding of intellectual disability.

In *Hall*, the Supreme Court held that Florida's "rigid rule" interpreting section 921.137(1) as establishing a strict IQ test score cutoff of 70 or less in order to present additional evidence of intellectual disability "creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional." 572 U.S. at 704. The Court further held that when assessing the subaverage intellectual functioning prong of the intellectual disability standard, courts must take into account the standard error of measurement of IQ tests, which

is five points.  *Id.* at 723.  And "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error [±5], the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits."  *Id.*

In *Walls*, we considered whether, under the standards set out in *Witt v. State*, 387 So. 2d 922 (Fla. 1980), *Hall* warranted retroactive application to cases on collateral review.  *Walls*, 213 So. 3d at 346.  Under *Witt*, a change in the law "only appl[ies] retroactively if the change '(a) emanates from this Court or the United States Supreme Court, (b) is constitutional in nature, and (c) constitutes a development of fundamental significance.' "  *Id.* (quoting *Witt*, 387 So. 2d at 931).  We acknowledged that "[i]t is without question that the *Hall* decision emanates from the United States Supreme Court and is constitutional in nature."  *Id.*  Regarding the third prong of the *Witt* analysis, a decision is of fundamental significance when it either (1) places beyond the authority of the state the power to regulate certain conduct or to impose certain penalties or (2) when the rule is of sufficient magnitude to necessitate retroactive application under the retroactivity test of *Stovall v. Denno*, 388 U.S. 293, 297 (1967), and *Linkletter v. Walker*, 381 U.S. 618, 636 (1965).  *See id.*; *Hernandez v. State*, 124 So. 3d 757, 764 (Fla. 2012); *Witt*, 387 So. 2d at 929.  In concluding that *Hall* met the third prong of the *Witt* analysis, we declared "that *Hall* warrants retroactive application as a

development of fundamental significance that places beyond the State of Florida the power to impose a certain sentence—the sentence of death for individuals within a broader range of IQ scores than before." *Walls*, 213 So. 3d at 346. Based on this declaration, we determined that *Hall* warranted retroactive application. Upon further consideration, we have determined that this Court clearly erred in reaching that conclusion and we now recede from our decision in *Walls*.

**B. The Error in the Analysis in *Walls***

Because it remains clear that *Hall* establishes a new rule of law that emanates from the United States Supreme Court and is constitutional in nature, it satisfies the first two prongs of *Witt*. *Witt*, 387 So. 2d at 931. Thus, the question of *Hall*'s retroactivity still turns on the third prong of *Witt*: whether the new rule constitutes a "development of fundamental significance." *Id.*

In *Walls*, this Court determined that the *Hall* decision met the third prong of the *Witt* analysis by "plac[ing] beyond the authority of the state the power to regulate certain conduct or impose certain penalties," because it "removes from the state's authority to impose death sentences more than just those cases in which the defendant has an IQ score of 70 or below" and is therefore of fundamental significance. *Walls*, 213 So. 3d at 346. We now conclude that this Court erred in making that determination.

In discussing developments of fundamental significance that fall within the category of changes of law that place beyond the authority of the state the power to regulate certain conduct or impose certain penalties, this Court in *Witt* cited as an example of a decision falling within that category *Coker v. Georgia*, 433 U.S. 584 (1977), which held that the Eight Amendment categorically prohibits the imposition of the death penalty for the crime of rape of an adult woman as cruel and unusual punishment. *Witt*, 387 So. 2d at 929. But contrary to the reasoning of the majority in *Walls*, "*Hall* places no categorical limitation on the authority of the state to impose a sentence of death." *Walls*, 213 So. 3d at 350 (Canady, J., dissenting). The example of *Coker* is totally inapposite.

In *Hall*, the Supreme Court recounted its decisions holding that particular punishments are prohibited by the Eighth Amendment "as a categorical matter," such as the denaturalization of natural-born citizens as a punishment, *Hall*, 572 U.S. at 708 (citing *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion)), the imposition of the death penalty for crimes committed by juveniles, *id.* (citing *Roper v. Simmons*, 543 U.S. 551, 572 (2005)), "[a]nd, as relevant for [*Hall*]," the imposition of the death penalty on persons who are intellectually disabled, *id.* (citing *Atkins*, 536 U.S. at 321). The Court then unambiguously set out the issue it was to address: "The question this case presents is *how* intellectual disability must be defined in order to *implement* . . . the holding of *Atkins*." *Id.* at 709 (emphasis

- 12 -

added).  And the holding of *Hall* was limited to a determination that it is unconstitutional for courts to refuse to allow capital defendants whose IQ scores are above 70 but within the test's standard error of measurement to present evidence of their asserted adaptive deficits.  *Hall*, 572 U.S. at 723.  Thus, *Hall* merely "created a procedural requirement that those with IQ test scores within the test's standard of error would have the *opportunity* to otherwise show intellectual disability."  *In re Henry*, 757 F.3d 1151, 1161 (11th Cir. 2014).[4]

The categorical prohibition on executing the intellectually disabled was not expanded by *Hall*.  *See Walls*, 213 So. 3d at 350 (Canady, J., dissenting) ("*Hall* . . . does not preclude death sentences for individuals whose scores fall within the SEM.").  The issue addressed in *Hall* was not whether the State is categorically prohibited from executing those intellectually disabled defendants with IQs above 70, but within the SEM.  Intellectually disabled persons with IQ scores above 70 are not a distinct class from intellectually disabled persons with IQ scores of 70 or below; all are members of the same class protected by *Atkins*.  *In re Hill*, 777 F.3d 1214, 1223 (11th Cir. 2015) ("*Hall* merely provides new procedures for ensuring that States do not execute members of an already protected group."); *Henry*, 757

---

4.  The new rule announced in *Hall* is a procedural rule because it "regulate[s] only the *manner of determining* the defendant's culpability."  *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004) ("[R]ules that regulate only the *manner of determining* the defendant's culpability are procedural.").

- 13 -

F.3d at 1161 ("The Supreme Court made clear in *Hall* that the class affected by the new rule—those with an intellectual disability—is identical to the class protected by *Atkins*. . . . *Hall* did not expand this class; instead, the Supreme Court limited the states' power to define the class . . . ."); *Elmore v. Shoop*, No. 1:07-CV-776, 2019 WL 5287912, at *4 (S.D. Ohio Oct. 18, 2019) ("[The class of people which is addressed in *Hall*] is the same class of people that *Atkins* found ineligible for the death penalty because that is the definition of mental retardation/intellectual disability the Court used in *Atkins*. What *Hall* did was to preclude the State of Florida from using an IQ score of 70 as an automatic disqualification for proving that a person is in the class of people [who], on account of their intellectual disability, may not be executed if they commit murder.").

The conclusion "that *Hall* warrants retroactive application as a development of fundamental significance that places beyond the State of Florida the power to impose a certain sentence" because it *may* prohibit execution of intellectually disabled persons "within a broader range of IQ scores than before," *Walls*, 213 So. 3d at 346, is therefore incorrect. *Hall* does not place beyond the authority of the State the power to regulate certain conduct or impose certain penalties; *Hall* merely more precisely defined the procedure that is to be followed in certain cases to determine whether a person facing the death penalty is intellectually disabled. *Hall* is merely an application of *Atkins*. *Kilgore v. Sec'y, Florida Dept. of Corr.*,

- 14 -

805 F.3d 1301, 1314 (11th Cir. 2015) ("[*Hall*] merely provides new *procedures* for ensuring that states follow the rule enunciated in *Atkins*."). *Hall*'s limited procedural rule does nothing more than provide certain defendants—those with IQ scores within the test's margin of error—with the opportunity to present additional evidence of intellectual disability. Thus, *Hall* does not constitute "a development of fundamental significance that places beyond the State of Florida the power to impose a certain sentence," *Walls*, 213 So. 3d at 346.

### C. *Hall* is an Evolutionary Refinement

Although this Court in *Walls* did not consider whether *Hall* falls within *Witt*'s second category of developments of fundamental significance—that is, a change of "sufficient magnitude" under the *Stovall*/*Linkletter* test—having receded from our conclusion that it falls within the first, we do so now.

In order to determine whether a new rule of law is of "sufficient magnitude" to merit retroactive application, this Court considers the following three factors of the *Stovall*/*Linkletter* test adopted in *Witt*: "(a) the purpose to be served by the new rule; (b) the extent of reliance on the old rule; and (c) the effect on the administration of justice of a retroactive application of the new rule." *Witt*, 387 So. 2d at 926. We agree with the reasons given by the *Walls* dissent as to why these factors counsel against the retroactive application of *Hall*:

> *Hall* should not be given retroactive effect under the *Stovall/Linkletter* test based on (a) *Hall*'s purpose of adjusting at the margin the

- 15 -

definition of IQ scores that evidence significant subaverage intellectual functioning, (b) the State's reliance on *Cherry*'s holding in numerous cases over an extended period of time, and (c) the ongoing threat of major disruption to application of the death penalty resulting from giving retroactive effect to *Hall* as well as similar future changes in the law regarding aspects of the definition of intellectual disability.

*Walls*, 213 So. 3d at 351 (Canady, J., dissenting) (footnote omitted).

Moreover, our Court in *Witt* equated new rules of law that are of "sufficient magnitude" to merit retroactive application with "jurisprudential upheavals." *Witt*, 387 So. 2d at 929. *Gideon v. Wainwright*, 372 U.S. 335 (1963)—which first announced that each state must provide counsel to every indigent defendant charged with a felony at all critical stages of the proceeding—"is the prime example of a law change included within this category." *Witt*, 387 So. 2d at 929. "In contrast to these jurisprudential upheavals are evolutionary refinements in the criminal law, affording new or different standards for the admissibility of evidence, for procedural fairness, for proportionality review of capital cases, and for other like matters." *Id.*

*Hall* is an evolutionary refinement of the procedure necessary to comply with *Atkins*. It merely clarified the manner in which courts are to determine whether a capital defendant is intellectually disabled and therefore ineligible for the death penalty. *Roybal v. Chappell*, No. 99CV2152-JM (KSC), 2014 WL 3849917, at *2 (S.D. Cal. Aug. 5, 2014) (stating that *Hall* was a clarification of Florida's implementation of *Atkins*). It did not invalidate any statutory means for

- 16 -

imposing the death sentence, nor did it prohibit the states from imposing the death penalty against any new category of persons.

Before *Walls*, this Court had been clear that evolutionary refinements do not apply retroactively. *See, e.g.*, *State v. Barnum*, 921 So. 2d 513, 526 (Fla. 2005) ("*Witt* dictates that those decisions constituting 'evolutionary refinements' and not 'jurisprudential upheavals' should not be applied retroactively." (quoting *Witt*, 387 So. 2d at 929)); *State v. Glenn*, 558 So. 2d 4, 8 (Fla. 1990) ("Applying the principles of *Witt*, we conclude that *Carawan* was an evolutionary refinement of the law which should not have retroactive application."). As an evolutionary refinement, *Hall* "do[es] not compel an abridgement of the finality of judgments." *Witt*, 387 So. 2d at 929. It is not of sufficient magnitude to warrant retroactive application to cases on collateral review.

In *Walton v. State*, 77 So. 3d 639 (Fla. 2011), we rejected a claim that the United States Supreme Court's decision in *Porter v. McCollum*, 558 U.S. 30 (2009), warranted retroactive application. *Porter* was a fact-intensive decision in which the Supreme Court held that in a particular case, this Court had unreasonably applied the prejudice test for establishing ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 688 (1984). We held in *Walton* that

> the decision in *Porter* d[id] not concern a major change in
> constitutional law of fundamental significance. Rather, *Porter*

- 17 -

involved a mere application and evolutionary refinement and development of the *Strickland* analysis, i.e., it addressed a misapplication of *Strickland*. *Porter*, therefore, does not satisfy the retroactivity requirements of *Witt*.

*Walton*, 77 So. 3d at 644. Similarly, as explained above, *Hall* involved a mere application and evolutionary refinement of the *Atkins* analysis and therefore does not satisfy the retroactivity requirements of *Witt*.

**D. Federal Law Does Not Require Retroactive Application of *Hall***

Finally, we must consider whether federal law requires retroactive application of *Hall*. Under *Teague v. Lane*, 489 U.S. 288 (1989), state courts must give retroactive effect to new substantive rules of federal constitutional law. *Montgomery v. Louisiana*, 136 S. Ct. 718, 728-29 (2016) (holding "that when a new substantive rule of [federal] constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to that rule" under the first prong of *Teague*'s retroactivity analysis).[5] Substantive rules set forth categorical constitutional guarantees that place certain criminal laws

_____

5. Although the federal standard for determining retroactivity under *Teague* is a two-pronged approach stating that courts must give retroactive effect to (1) new substantive rules of federal constitutional law and (2) new watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, *Montgomery* held only that substantive rules of federal constitutional law must be applied retroactively by state courts. The Court in *Montgomery* explicitly declined to address "the constitutional status of *Teague*'s exception for watershed rules of procedure." 136 S. Ct. at 729.

and punishments altogether beyond the State's power to impose. *Id.* at 729. In contrast, procedural rules are designed to enhance the accuracy of a conviction or sentence by regulating the manner of determining the defendant's culpability and merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. *Id.* at 730. Because we have concluded that *Hall* announced a new procedural rule, which does not categorically place certain criminal laws and punishments altogether beyond the State's power to impose but rather regulates only the manner of determining the defendant's culpability, we conclude that federal law does not require retroactive application of *Hall* as a new substantive rule of federal constitutional law. *Hall* is similar to other nonretroactive "decisions [that] altered the processes in which States must engage before sentencing a person to death," which "may have had some effect on the likelihood that capital punishment would be imposed" but which did not render "a certain penalty unconstitutionally excessive for a category of offenders." *Id*. at 736.

### E.  Receding from *Walls*

Having concluded that *Hall* does not satisfy the *Witt* analysis for retroactivity and that it is not a new substantive rule of federal constitutional law requiring retroactive application to cases on collateral review, we are now faced with the question of whether the policy of stare decisis should yield.

We recently discussed the doctrine of stare decisis, stating:

> While this Court has consistently acknowledged the importance of *stare decisis*, it has been willing to correct its mistakes. In a recent discussion of *stare decisis*, we said:
>
> > *Stare decisis* provides stability to the law and to the society governed by that law. Yet *stare decisis* does not command blind allegiance to precedent. "Perpetuating an error in legal thinking under the guise of stare decisis serves no one well and only undermines the integrity and credibility of the court."
>
> *Shepard v. State*, 259 So. 3d 701, 707 (Fla. 2018) (quoting *State v. Gray*, 654 So. 2d 552, 554 (Fla. 1995)). Similarly, we have stated that "[t]he doctrine of stare decisis bends . . . where there has been an error in legal analysis." *Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002). And elsewhere we have said that we will abandon a decision that is "unsound in principle." *Robertson v. State*, 143 So. 3d 907, 910 (Fla. 2014) (quoting *Brown v. Nagelhout*, 84 So. 3d 304, 309 (Fla. 2012)).
>
> It is no small matter for one Court to conclude that a predecessor Court has clearly erred. The later Court must approach precedent presuming that the earlier Court faithfully and competently carried out its duty. A conclusion that the earlier Court erred must be based on a searching inquiry, conducted with minds open to the possibility of reasonable differences of opinion. "[T]here is room for honest disagreement, even as we endeavor to find the correct answer." *Gamble v. United States*, 139 S. Ct. 1960, 1986 (2019) (Thomas, J., concurring).

*State v. Poole*, 45 Fla. L. Weekly S41, S47-48 (Fla. Jan. 23, 2020), *clarified*, 45 Fla. L. Weekly S121 (Fla. Apr. 2, 2020).

We cannot escape the conclusion that this Court in *Walls* clearly erred in concluding that *Hall* applies retroactively. We say that based on our review of *Hall*, our state's judicial precedents regarding retroactivity, and the decisions of federal habeas courts concluding that *Hall* does not apply retroactively. Based on

- 20 -

its incorrect legal analysis, this Court used *Hall*—which merely created a limited procedural rule for determining intellectual disability that should have had limited practical effect on the administration of the death penalty in our state—to undermine the finality of numerous criminal judgments. As in *Poole*, "[u]nder these circumstances, it would be unreasonable for us *not* to recede from [*Walls'*] erroneous holdings." *Id.* at S48.

"[O]nce we have chosen to reassess a precedent and have come to the conclusion that it is clearly erroneous, the proper question becomes whether there is a valid reason *why not* to recede from that precedent. . . . The critical consideration ordinarily will be reliance." *Id.* But

> reliance interests are "at their acme in cases involving property and contract rights." *Payne v. Tennessee*, 501 U.S. 808, 828 (1991). And reliance interests are lowest in cases—like this one—"involving procedural and evidentiary rules." *Id.*; *see also Alleyne*, 570 U.S. at 119 (Sotomayor, J., concurring) ("[W]hen procedural rules are at issue that do not govern primary conduct and do not implicate the reliance interests of private parties, the force of *stare decisis* is reduced.").

*Id.*

As the expectant potential beneficiary of the erroneous decision in *Walls*, Phillips has no concrete reliance interest; he has in no way changed his position in reliance on *Walls*. In this postconviction context, Phillips's interest as an expectant potential beneficiary of *Walls* is set against all the interests that support maintaining the finality of Phillips's judgment. The surviving victims, society-at-

- 21 -

large, and the State all have a weighty interest in not having Phillips's death sentence set aside for the relitigation of his claim of intellectual disability based on *Hall*'s evolutionary refinement in the law.

Thus, we conclude that we should not continue to apply the erroneous reasoning of *Walls*. And because *Hall* does not apply retroactively, it does not entitle Phillips to a reconsideration of whether he meets the first prong of the intellectual disability standard.

### F. *Moore*

Phillips also asserts that he is entitled to a new determination as to whether he meets the adaptive deficits prong of the intellectual disability standard because the circuit court in 2006 and this Court in 2008 improperly relied on his adaptive strengths in concluding that he did not meet the adaptive deficits prong, assertedly in violation of the Supreme Court's recent decision in *Moore*. But because Phillips has conclusively failed to establish that he meets the first prong of the intellectual disability standard, he cannot be found to be intellectually disabled even if he were entitled to a renewed determination on the second prong and could establish that he has deficits in adaptive behavior. As we have repeatedly stated, if a defendant fails to prove that he or she meets any one of the three prongs of the intellectual disability standard, he or she will not be found to be intellectually disabled. *E.g.*,

*Jones v State*, 231 So. 3d 374, 376 (Fla. 2017); *Salazar v. State*, 188 So. 3d 799, 812 (Fla. 2016).  Thus, we need not address his *Moore* claim.

### III.  CONCLUSION

For these reasons, we affirm the circuit court's order denying Phillips's successive motion for postconviction relief.  We also recede from our prior opinion in *Walls* and hold that *Hall* does not apply retroactively.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, and MUÑIZ, JJ., concur.
LABARGA, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., dissenting.

Yet again, this Court has removed an important safeguard in maintaining the integrity of Florida's death penalty jurisprudence.  The result is an increased risk that certain individuals may be executed, even if they are intellectually disabled—a risk that this Court mitigated just three years ago by holding that the decision in *Hall v. Florida*, 572 U.S. 701 (2014), is to be retroactively applied.  *See Walls v. State*, 213 So. 3d 340 (Fla. 2016).  I strongly dissent to the majority's decision to recede from *Walls*, and I write to underscore the unraveling of sound legal holdings in this most consequential area of the law.

- 23 -

Before the United States Supreme Court's decision in *Hall*, under Florida law, individuals with an IQ score above 70 were barred from demonstrating that they were intellectually disabled. This "rigid rule," as described by the Supreme Court, "creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional." *Hall*, 572 U.S. at 704. The Supreme Court stated:

> The Florida statute, as interpreted by its own courts, misuses IQ score on its own terms; and this, in turn, bars consideration of evidence that must be considered in determining whether a defendant in a capital case has intellectual disability. Florida's rule is invalid under the Constitution's Cruel and Unusual Punishment Clause.

*Id.* at 723.

In concluding that Florida's intellectual disability law violated the Eighth Amendment, the Supreme Court pointedly criticized the "mandatory cutoff" that "disregards established medical practice in two interrelated ways": (1) "tak[ing] an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence," and (2) "rel[ying] on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise." *Id.* at 712. The "other evidence" to which the Court referred primarily consists of evidence of deficits in adaptive functioning, which is "an essential part of a sentencing court's inquiry." *Id.* at 724. The Supreme Court concluded: "This Court agrees with the

medical experts that when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id.* at 723. The Court admonished that while "the States play a critical role in advancing protections and providing the Court with information that contributes to an understanding of how intellectual disability should be measured and assessed," states do not have "unfettered discretion to define the full scope of the constitutional protection." *Id.* at 719.

The categorical prohibition of the execution of the intellectually disabled is not limited to those whose convictions and sentences became final after a certain date. However, the import of today's decision is that some individuals whose convictions and sentences were final before *Hall* was decided, despite timely preserved claims of intellectual disability, are not entitled to consideration of their claims in a manner consistent with *Hall*. What this means is that an individual with significant deficits in adaptive functioning, and who under a holistic consideration of the three criteria for intellectual disability could be found intellectually disabled, is completely barred from proving such because of the timing of his legal process. This arbitrary result undermines the prohibition of executing the intellectually disabled.

"Considerations of fairness and uniformity make it very 'difficult to justify depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases.' " *Witt v. State*, 387 So. 2d 922, 925 (Fla. 1980) (quoting ABA Standards Relating to Postconviction Remedies 37 (Approved Draft 1968)). If *Hall* is not retroactively applied in a uniform manner, an intellectually disabled individual on Florida's death row may eventually be put to death.

I reject the majority's conclusion that *Hall* was a mere procedural evolution in the law. When the law develops in such a manner as to clarify the criteria for intellectual disability—a status which poses an absolute bar to execution—this cannot simply be deemed "an evolutionary refinement." Majority op. at 16. *Walls* properly concluded that *Hall* was a "development of fundamental significance that places beyond the State of Florida the power to impose a certain sentence—the sentence of death for individuals within a broader range of IQ scores than before." *Walls*, 213 So. 3d at 346.

What is especially troubling is that because this Court held *Hall* to be retroactive more than three years ago in *Walls*, some individuals have been granted relief pursuant to *Walls* and received consideration of their intellectual disability claims under the standard required by *Hall*. However, going forward, similarly

situated individuals will not be entitled to such consideration. This disparate treatment is patently unfair.

In justifying its holding, the majority discusses the need for finality in the judicial process. I agree that finality is a fundamental component of a functioning judicial system. However, we simply cannot be blinded by an interest in finality when that interest leaves open the genuine possibility that an individual will be executed because he is not permitted consideration of his intellectual disability claim. "No legitimate penological purpose is served by executing a person with intellectual disability. To do so contravenes the Eighth Amendment, for to impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being." *Hall*, 572 U.S. at 708 (citation omitted) (citing *Atkins v. Virginia*, 536 U.S. 304, 317-20 (2002)). "This is not to say that under current law persons with intellectual disability who 'meet the law's requirements for criminal responsibility' may not be tried and punished. They may not, however, receive the law's most severe sentence." *Id.* at 709 (citation omitted) (quoting *Atkins*, 536 U.S. at 306).

*Hall* concluded with language that we would all do well to remember:

> The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution. Florida's law contravenes our Nation's commitment to dignity and its duty to teach human decency as the mark of a civilized world. The

States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects.

*Hall*, 572 U.S at 724.

Today's decision potentially deprives certain individuals of consideration of their intellectual disability claims, and it results in an inconsistent handling of these cases among similarly situated individuals.

For these reasons, I dissent.

An Appeal from the Circuit Court in and for Miami-Dade County,
Nushin G. Sayfie, Judge - Case No 131983CF0004350001XX

Neal Dupree, Capital Collateral Regional Counsel, William M. Hennis III, Litigation Director, and Marta Jaszczolt, Staff Attorney, Capital Collateral Regional Counsel, Southern Region, Fort Lauderdale, Florida,

for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Lisa-Marie Lerner, Assistant Attorney General, West Palm Beach, Florida,

for Appellee